IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

CARLOS CAREY,                              )
AIS #245045,                              )
                                          )
            Plaintiff,                    )
                                          )
v.                                        )        CIVIL ACTION NO. 2:13-CV-884-WHA
                                          )
WARDEN RENE MASON, et al,                 )
                                          )
            Defendants.                   )

## RECOMMENDATION OF THE MAGISTRATE JUDGE

## I.  INTRODUCTION

This 42 U.S.C. § 1983 action is pending before the court on an amended complaint and amendment thereto filed by Carlos Carey ("Carey"), a state inmate and frequent litigant before this court.  In the instant complaint, Carey challenges actions which occurred at the Bullock Correctional Facility in November and December of 2013.  *Amendment to the Compl. - Doc. No. 10* at 2.  Specifically, Carey alleges that the defendants extended his segregation time, removed his mattress from his segregation cell, advised other inmates he was a snitch, attempted to bribe other inmates to cause him harm and threatened him with violence in retaliation for his voicing complaints to prison officials and filing/refusing to dismiss a prior lawsuit in this court.  *Id*. at 3-4.  Carey names Rene Mason, Clatys Jenkins, Dominic Whitley, Cedric King, Clevon Randolph, Kenneth Jones and Sandra Giles, all correctional officials employed at Bullock at the time relevant to the complaint, as

defendants.  Carey seeks a declaratory judgment, injunctive relief and monetary damages for the alleged violations of his constitutional rights.

The defendants filed a special report and supporting evidentiary materials addressing Carey's claims for relief.  In these documents, the defendants deny they retaliated against Carey for exercising his First Amendment rights.

Upon receipt of the defendants' special report, the court issued an order directing Carey to file a response to the reports, including affidavits, sworn statements or other evidentiary materials.  *Order of March 20, 2014 - Doc. No. 24* at 2.  This order specifically cautioned Carey that unless "**sufficient legal cause**" is shown within fifteen days of entry of this order "**why such action should not be undertaken**, . . . the court may at any time [after expiration of the time for his filing a response to this order] and **without further notice to the parties** (1) treat the special report and any supporting evidentiary materials as a motion for summary judgment and (2) after considering any response as allowed by this order, rule on the motion for summary judgment in accordance with the law." *Id*. at 2-3.  Carey filed a sworn response (Doc. No. 42) and affidavits (Doc. No. 43-1 at 1-2) in opposition to the defendants' report.

Pursuant to the order entered on March 20, 2014, the court deems it appropriate to treat the defendants' report as a motion for summary judgment.  Thus, this case is now pending on the defendants' motion for summary judgment.  Upon consideration of the defendants' motion for summary judgment, the evidentiary materials filed in support thereof, the amended complaint, the amendment to the complaint and the responses to the

2

defendants' report filed by Carey, the court concludes that summary judgment is due to be granted in favor of the defendants.

## II.  SUMMARY JUDGMENT STANDARD

"Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine [dispute] as to any material fact and that the moving party is entitled to judgment as a matter of law.'"  *Greenberg v. BellSouth Telecomm., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (per curiam) (citation to former rule omitted); Fed. R. Civ. P. Rule 56(a) ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.").[1]  The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [record, including pleadings, discovery materials and affidavits], which it believes demonstrate the absence of a genuine [dispute] of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593 (11th Cir. 1995) (moving party has initial burden of showing there is no genuine dispute of material fact for trial).  The movant may meet this burden by presenting evidence indicating there is no dispute of

---

[1]Although stylistic changers were made to Rule 56 in December of 2010, the revision of "[s]ubdivision (a) carries forward the summary-judgment standard expressed in former subdivision (c), changing only one word -- genuine 'issue' becomes genuine 'dispute.'  'Dispute' better reflects the focus of a summary-judgment determination."  *Id.*  "'Shall' is also restored to express the direction to grant summary judgment."  *Id.*  Despite these changes, the substance of Rule 56 remains the same and, therefore, all cases citing prior versions of the rule remain equally applicable to the current rule.

material fact or by showing that the nonmoving party has failed to present appropriate evidence in support of some element of its case on which it bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322-324.

The defendants have met their evidentiary burden and demonstrated the absence of any genuine dispute of material fact with respect to the claims presented by the plaintiff. Based on the foregoing, the burden shifts to the plaintiff to establish, with appropriate evidence beyond the pleadings, that a genuine dispute material to his case exists. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Celotex*, 477 U.S. at 324; Fed. R. Civ. P. 56(e)(3) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact by [citing to materials in the record including affidavits, relevant documents or other materials] the court may . . . grant summary judgment if the motion and supporting materials -- including the facts considered undisputed -- show that the movant is entitled to it."); *Jeffery*, 64 F.3d at 593-594 (internal quotation marks omitted) (Once the moving party meets its burden, "the non-moving party must then go beyond the pleadings, and by its own affidavits [or statements made under penalty of perjury], or by depositions, answers to interrogatories, and admissions on file," demonstrate that there is a genuine dispute of material fact.). This court will also consider "specific facts" pled in a plaintiff's sworn complaint when considering his opposition to summary judgment. *Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1098 (11th Cir. 2014). A genuine dispute of material fact exists when the nonmoving party produces evidence that would allow a reasonable fact-finder to return a verdict in its favor.

4

*Greenberg*, 498 F.3d at 1263; *Allen v. Bd. of Pub. Educ. for Bibb Cty.*, 495 F.3d 1306, 1313 (11th Cir. 2007).

> In civil actions filed by inmates, federal courts
>
> must distinguish between evidence of disputed facts and disputed matters of professional judgment.  In respect to the latter, our inferences must accord deference to the views of prison authorities.  Unless a prisoner can point to sufficient evidence regarding such issues of judgment to allow him to prevail on the merits, he cannot prevail at the summary judgment stage.

*Beard v. Banks*, 548 U.S. 521, 530 (2006) (internal citation omitted).  To proceed beyond the summary judgment stage, an inmate-plaintiff is required to produce "sufficient [favorable] evidence" which would be admissible at trial supporting his claims of constitutional violations.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); Fed. R. Civ. P. 56(e).  "If the evidence [on which the nonmoving party relies] is merely colorable . . . or is not significantly probative . . . summary judgment may be granted."  *Anderson*, 477 U.S. at 249-250.  "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the [trier of fact] could reasonably find for that party.  *Anderson v. Liberty Lobby*, 477 U.S. 242 [ ] (1986)."  *Walker v. Darby*, 911 F.2d 1573, 1576-1577 (11th Cir. 1990).  Conclusory allegations based on subjective beliefs are likewise insufficient to create a genuine dispute of material fact and, therefore, do not suffice to oppose a motion for summary judgment.  *Holifield v. Reno*, 115 F.3d 1555, 1564 n.6 (11th Cir. 1997) (A plaintiff's "conclusory assertions . . ., in the absence of [admissible] supporting evidence, are insufficient to withstand summary judgment.");  *Harris v. Ostrout*, 65 F.3d 912, 916 (11th Cir. 1995) (grant of summary

judgment appropriate where inmate produces nothing beyond "his own conclusory allegations" challenging actions of the defendants); *Fullman v. Graddick*, 739 F.2d 553, 557 (11th Cir. 1984) ("Mere verification of party's own conclusory allegations is not sufficient to oppose summary judgment."); *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985) ("[C]onclusory allegations without specific supporting facts have no probative value.").  Hence, when a plaintiff fails to set forth specific facts supported by requisite evidence sufficient to establish the existence of an element essential to his case and on which the plaintiff will bear the burden of proof at trial, summary judgment is due to be granted in favor of the moving party.  *Celotex*, 477 U.S. at 322 ("[F]ailure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."); *Barnes v. Sw. Forest Indus., Inc.*, 814 F.2d 607, 609 (11th Cir. 1987) (If on any part of the prima facie case the plaintiff presents insufficient evidence to require submission of the case to the trier of fact, granting of summary judgment is appropriate.); *Chapman v. AI Transp.*, 229 F.3d 1012, 1023 (11th Cir. 2000) (en banc) (summary judgment appropriate where no genuine dispute of material fact exists).  At the summary judgment stage, this court must "consider all evidence in the record . . . [including] pleadings, depositions, interrogatories, affidavits, etc. -- and can only grant summary judgment if everything in the record demonstrates that no genuine [dispute] of material fact exists."  *Strickland v. Norfolk S. Ry. Co.*, 692 F.3d 1151, 1154 (11th Cir. 2012).

For summary judgment purposes, only disputes involving material facts are relevant.  *United States v. One Piece of Real Prop. Located at 5800 SW 74th Ave., Miami,*

*Fla.*, 363 F.3d 1099, 1101 (11th Cir. 2004).   What is material is determined by the substantive law applicable to the case.   *Anderson*, 477 U.S. at 248; *Lofton v. Sec'y of the Dep't of Children and Family Servs.*, 358 F.3d 804, 809 (11th Cir. 2004) ("Only factual disputes that are material under the substantive law governing the case will preclude entry of summary judgment.").   "The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case."   *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003) (citation omitted).   To demonstrate a genuine dispute of material fact, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine [dispute] for trial.'"   *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).   In cases where the evidence before the court which is admissible on its face or which can be reduced to admissible form indicates there is no genuine dispute of material fact and the party moving for summary judgment is entitled to it as a matter of law, summary judgment is proper. *Celotex*, 477 U.S. at 323-324 (summary judgment appropriate where pleadings, evidentiary materials and affidavits before the court show no genuine dispute as to a requisite material fact); *Waddell v. Valley Forge Dental Assocs., Inc.*, 276 F.3d 1275, 1279 (11th Cir. 2001) (To establish a genuine dispute of material fact, the nonmoving party must produce evidence such that a reasonable trier of fact could return a verdict in his favor.).

Although factual inferences must be viewed in a light most favorable to the nonmoving party and *pro se* complaints are entitled to liberal interpretation, a *pro se* litigant does not escape the burden of establishing by sufficient evidence a genuine dispute of material fact. *Beard*, 548 U.S. at 525; *Brown v. Crawford*, 906 F.2d 667, 670 (11th Cir. 1990). Thus, the plaintiff's *pro se* status alone does not mandate this court's disregard of elementary principles of production and proof in a civil case.

The court has undertaken a thorough and exhaustive review of all the evidence contained in the record. After such review, the court finds that Carey has failed to demonstrate a genuine dispute of material fact in order to preclude the entry of summary judgment in favor of the defendants.

### III.  ABSOLUTE IMMUNITY

To the extent Carey sues the defendants in their official capacities, they are immune from monetary damages. Official capacity lawsuits are "in all respects other than name, . . . treated as a suit against the entity." *Kentucky v. Graham*, 473 U. S. 159, 166 (1985). "A state official may not be sued in his official capacity unless the state has waived its Eleventh Amendment immunity, *see Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 100, 104 S.Ct. 900, 908, 79 L.Ed.2d 67 (1984), or Congress has abrogated the state's immunity, *see Seminole Tribe v. Florida*, [517 U.S. 44, 59], 116 S.Ct. 1114, 1125, 134 L.Ed.2d 252 (1996). Alabama has not waived its Eleventh Amendment immunity, *see Carr v. City of Florence*, 916 F.2d 1521, 1525 (11th Cir. 1990) (citations omitted), and Congress has not abrogated Alabama's immunity. Therefore, Alabama state officials are

8

immune from claims brought against them in their official capacities." *Lancaster v. Monroe Cty.*, 116 F.3d 1419, 1429 (11th Cir. 1997).

In light of the foregoing and under the facts of this case, the defendants are entitled to sovereign immunity under the Eleventh Amendment for claims seeking monetary damages from them in their official capacities. *Lancaster*, 116 F.3d at 1429; *Jackson v. Ga. Dep't of Transp.*, 16 F.3d 1573, 1575 (11th Cir. 1994); *Parker v. Williams*, 862 F.2d 1471 (11th Cir. 1989).

## IV.  RELEVANT FACTS

On August 22, 2013, defendant Whitley charged Carey with five (5) disciplinary infractions for various violations of administrative rules. *Defs.' Exh. H - Doc. No. 23-8* at 11-63.  The charges lodged against Carey included (i) failure to obey a direct order due to his failure to leave defendant Mason's office when ordered to do so, (ii) assault on a person associated with ADOC for spitting on defendant Whitley, (iii) insubordination for cursing defendant Mason, (iv) intentionally creating a security, safety or health hazard by spitting on defendant Whitley's shirt, and (v) disorderly conduct when he referred to defendant Whitley in a racially derogatory manner. *Id*.  After receiving a disciplinary hearing on each charge, the hearing officer, defendant Randolph, found Carey guilty of the charged offenses.  The punishment imposed upon Carey for his violations of the rules included a cumulative total of 180 days of confinement in disciplinary segregation.  In addition, it is standard operating procedure to remove mattresses from the cells of inmates confined in

disciplinary segregation Monday through Friday from 7:00 a.m. until 4:00 p.m.  *See Defs.'*

*Exh. D - Doc. No. 23-4* at 4-5.

## V.  CLAIMS FOR RELIEF

### A.  Retaliation

Carey alleges that in November and December of 2013 the defendants verbally

threatened and harassed him for filing a previous lawsuit and complaining of actions by

correctional officers.  Specifically, Carey alleges that Warden Mason responded to his

complaints against the officers by telling his cell mate "to watch what you say around

[Carey] because he will tell me everything I need to know" in ear shot of other inmates

which led to problems with his cell mate and other inmates.  *Amendment to the Amended*

*Complaint - Doc. No. 10* at 2-3.  Carey further alleges that officers King, Whitley and

Randolph threatened him with violence and continually tried to bribe other inmates to harm

him.  *Id*. at 3.  Finally, Carey contends that when he advised Capt. Jenkins of the behavior

of the officers, Jenkins advised Carey "he was a member of the Blood gang" and threatened

Carey with reprisal by members of this gang.  *Id*.  Carey further alleges that Jenkins

retaliated against him by increasing his segregation "time from 45 days to 6 months and

then took my mattress so that I am sleeping on the floor.  My mattress now is taken every

day." *Id*.

The defendants adamantly deny taking any action against Carey in retaliation for

filing a lawsuit or due to his complaints regarding the actions of correctional officials. The

affidavits and evidentiary materials submitted by the defendants, including documents

contained in Carey's institutional file which were contemporaneously compiled during his

incarceration, support this assertion.

Warden Mason provides the following response to Carey's claims:

1.  I have not seen and/or talked to Inmate Carey since August 22, 2013; the day he arrived at this facility and the day he was placed in the Segregation Unit due to his violent assaultive behavior. Therefore; Inmate Carey's claims that I have said anything to him, threatened him with "perjury," and/or asked him to drop his lawsuit(s) are false. Inmate Carey has never complained to me, verbally and/or in writing that Officers are retaliating against him for filing complaints. He has never written me a request slip. The only correspondences I have received concerning Inmate Carey are the lawsuits he has filed in Federal Court. I have never threatened him with violence or punished him because of his lawsuits. I have not had any contact and/or conversation with Inmate Carey since the date of the incident on August 22, 2013.

2.   Inmate Carey's allegation that I have talked to his cellmate is false. Inmate Carey was placed in a cell with Inmate Kenneth Hill (181096), Cell B1-15A, upon arrival to the Segregation Unit on August 22, 2013. Inmate Carey had this cellmate for one month while housed in the Segregation Unit and that was from August 22, 2013 to September 23, 2013. I have never spoken to Inmate Carey's cellmate, Inmate Kenneth Hill. I have never stated to any inmate, "Watch what you say around him because he will tell me everything I need to know."  Inmate Carey's claim that I have talked to him or his cellmate is false because I have not been in the Segregation Unit where both were housed.
    On September 23, 2013, Inmate Carey was moved to a single cell, Cell B1-3A pending close custody for his violent behavior. On September 30, 2013, the ADOC Central Classification Review Board changed Inmate Carey's custody from medium to close. Inmates pending close custody and/or who are in close custody must be housed in a single cell [pursuant to applicable administrative regulations]; no cell mate. Inmate Carey has remained in a single cell with no cell mate since September 23, 2013 [until the date of this affidavit - January 30, 2014].

3.  Inmate Carey does not have free movement to socialize and converse with other inmates in the Segregation Unit. Because Inmate Carey is housed in a single cell, away any from contact with other inmates, except when he is

allowed out to exercise, Inmate Carey is not in a dangerous environment as he claims. When he is allowed to exercise he can only exercise on the yard with a maximum of three other close custody inmates. All inmates are restrained when on the exercise yard.

4.  I have no knowledge nor have I ever received a written complaint from Inmate Carey that an Inmate threw urine and/or a mixture of something in his face. Inmate Carey continues to make allegations in law suits which cannot be substantiated and/or verified; they are false.

5.  Inmate Carey has never been denied access to any administrative process.

6. Inmate Carey's assertion that his disciplinary segregation time was reduced [and/or increased] because he filed a lawsuit is false. Inmate Carey's allegation the Captain of Security has changed his disciplinary segregation time is false. Inmate Carey's disciplinary segregation time, which he received due to his disciplinaries, has not changed. Inmate Carey received five disciplinaries for his rule violations on August 22, 2013; with the following segregation time:
    1.  Disorderly Conduct - 30 days Segregation
    2. Intentionally Creating a Security, Safety and/or Health Hazard - 30 days Segregation
    3. Insubordination - 30 days Segregation
    4. Assault on a Person associated with ADOC - 45 days Segregation
    5. Failure to Obey a Direct Order of an ADOC Employee - 45 days Segregation
The sanctions on the disciplinaries were approved by Warden Sandra Giles on August 30, 2013. Therefore; Inmate Carey has a total of 180 days of Segregation time; to wit: six (6) months.

*Defs.' Exh C - Doc. No. 23-3* at 1-3.  Wardens Jones and Giles also deny taking any action which violated Carey's rights.  *Defs.' Exh. A - Doc. No. 23-1* at 1-2 ("I have never threatened inmate Carey or used force on him….  I have never ordered anyone to use force on inmate Carey, nor have I ever attempted to intimidate him or directed any employee or inmate at Bullock Correctional Facility to attempt to intimidate him."); *Defs.' Exh. B - Doc. No. 23-2* at 1-2 ("I have no knowledge of any threats on inmate Carey's life, nor has inmate

12

Carey complained to me concerning any threats of violence or retaliation…..  I have not

… encouraged inmates to harm inmate Carey.  There has been no incident at Bullock

involving inmate Carey except the incident of August 22, 201[3], which resulted in a use

of force.)"[2]

Capt. Jenkins addresses Carey's claims as follows:

Inmate Carlos Carey in his lawsuit has made several false allegations against me:

1.  I have never threatened Inmate Carey with violence and/or … tried to bribe other inmates to harm him if he does not drop his chargers. I have never said anything to Inmate Carey concerning his lawsuits nor have I heard any officer say anything to Inmate Carey about his lawsuits. I have never tried to bribe an inmate to harm Inmate Carey if [he] does not drop the charges; and/or for any reason. I am the Captain of Security at Bullock Correctional Facility and it is my duty and responsibility to maintain security, custody and control of all inmates. This includes protecting inmates from themselves and/or others. All inmates are treated fairly and I try to maintain a high level of professionalism at all times due to my position and rank. It is imperative that I maintain a professional demeanor when dealing with inmates so that I can set an example for officers under my control. The only time I have had any contact with Inmate Carey in the Segregation Unit is once a week when I make segregation rounds in the Unit with the Segregation Review Board. At no time have I made any derogatory remarks toward Inmate Carey.

2.  Inmate Carey has never complained to me verbally and/or in writing about any officers, the way he is being treated, and/or any concerns. Inmate Carey has never voiced any concerns to me and/or to the Segregation Review Board when we make our rounds in the Segregation Unit. On one occasion while I was making rounds in the Segregation Unit, Inmate Carey did try to pass me an envelope through the door. Under no circumstances do I accept correspondences from an inmate in this manner. All inmates are to follow the procedures to send hand mail to staff. I instructed Inmate Carey to give his mail to the Segregation Officers, like all the inmates in Segregation do, and it will get to me. I never received any correspondence from Inmate Carey.

---

[2]Carey's claim regarding a use of excessive force against him on August 22, 2013 is pending before this court in a separate cause of action.  *See Carey v. Whitley, et al.*, Civil Action No. 2:13-CV-705-WKW-WC.

Because of the strict security policies, the physical lay-out of the Unit and the type of inmates that are housed in the Unit, the Segregation Unit Officers will notify me any time an inmate requests to speak with me. At no time has Inmate Carey told the Segregation Officers he needs to talk to me nor has he sent me any requests slips. Inmate Carey also claims in this lawsuit that Correctional Officers Clevon Randolph and Cedric King have threatened him with violence if he doesn't drop his lawsuit and that they have also tried to bribe inmates to harm him. Inmate Carey is housed in the Segregation Unit. Officers Randolph and King do not work the Segregation Unit and therefore they do not have direct contact with Inmate Carey when they are at work. There is no evidence to substantiate Inmate Carey's allegation. Inmate Carey has made the same allegation in this lawsuit against Sgt. Dominic Whitley. Inmate Carey claims the violations occurred in November and December of 2013. I have reviewed the Segregation Log sheets and during November and December, Sergeant Whitley entered the Segregation Unit on one day; November 8, 2013. On this date, Sergeant Whitley made a quick tour at the beginning and at the end of his shift.  He was in the Segregation Unit a combined total of less than ten minutes. Inmate Carey has never spoken to me concerning these officers and the Sergeant nor has he sent me a request slip reporting any misconduct by my staff.

3.  Inmate Carey claims that other inmates are harassing him. Inmate Carey is isolated from the other inmates and does not have any direct contact with inmates. The only time Inmate Carey has any contact with another inmate is when he is on the exercise yard; one hour a day. Inmate Carey's custody level mandates that he must be on the exercise yard by himself and/or with no more than three other Close custody inmates at the same time. All inmates are restrained when they are on the exercise yard and are under the direct supervision of the Segregation Officers at all times. They are also searched prior to entering the yard. Correctional Officers keep a close visual on the inmates on the exercise yard at all times and monitor their actions at all times. If there is any disruptive behavior from any inmate on the exercise yard, his yard time is immediately stopped and he is returned to his cell. An incident report is also completed and disciplinary action is taken against the disruptive inmate. There has … not [been] such [an] incident[] [reported] since Inmate Carey has been in the Segregation Unit. Segregation Officers will not allow any inmate to harass another inmate on the exercise yard. I have never been notified, since Inmate Carey has been in the Segregation Unit, that his yard time was interrupted due to disruptive behavior from him and/or other inmates. The Segregation Unit at Bullock Correctional Facility is very small and only has twenty cells. There are ten cells on each side of the hallway.

Inmates are not allowed to yell at each other from cell to cell. The Segregation Unit is patrolled by two trained Segregation Correctional Officers at all time[s]; this is not a security post available to all officers. Inmate Carey's allegation that he is being harassed by other inmates is false. There has been no incident[] in the Segregation Unit to validate Inmate Carey's allegations of harassment from inmates nor has Inmate Carey ever reported to me and/or the Segregation Officers that he is being harassed. It is my responsibility to investigate all complaints made by inmates housed in the Segregation Unit; no complaints have been received from Inmate Carey.

4.  Inmate Carey is presently serving one hundred and eighty days (180) disciplinary segregation time for five disciplinaries he received in August, 2013. Inmate Carey's disciplinary time has not changed since the day Warden Sandra Giles approved his disciplinaries, which was on August 30, 2013. Inmate Carey received a final copy of his disciplinaries with the approved sanctions on September 1, 2013. Inmate Carey's claim that his segregation time was only forty five (45) days is false. Inmate Carey's segregation time has been a total of one hundred and eighty days based on the combined sanctions he received from his five disciplinaries since August 30, 2013. Furthermore, I do not have the authority to change the segregation time sanction the Warden has approved on a disciplinary. Inmate Carey's claim that I have changed his disciplinary segregation time sanction imposed by the Warden of Bullock Correctional Facility is false.

5.  Inmate Carey is correct in his claim that his mattress was removed from his cell; however, he failed to mention the time frame his mattress is removed from his cell and the fact that all disciplinary segregation inmates have their mattresses removed from their cells certain hours of the day; Monday thru Friday. All inmates housed in the Segregation Unit for disciplinary segregation time have their mattresses removed during the day from the hours of 7:00am-4:00pm, Monday thru Friday. Disciplinary segregation inmates' mattresses are not removed from their cell on weekends. Inmate Carey's claim that his mattress is taken every day is false. Inmate Carey is not forced to sleep on concrete. Inmate Carey and all other disciplinary segregation inmates have their mattresses returned to them at 4:00pm Monday thru Friday. Inmate Carey is treated the same as all inmates serving disciplinary segregation time.

6.  Inmate Carey's claim that I am a member of a gang and/or a member of the gang "The Bloods" is not true. I am not nor have I ever been a member of a gang. I have never told Inmate Carey that I was a member of a gang nor

that I was a member of the gang "The Bloods." Inmate Carey's statement that I said I was a member of "The Bloods" in front of other inmates is a lie. Inmate Carey also made the statement in his lawsuit that I said I would get my "dawgs" to get him and that I said that in front of inmates this is also a lie. I have never used the word "dawg" nor have I stated to Inmate Carey or in front of inmates that I would "get my dawgs" to get him. Inmate Carey further stated in this lawsuit that "dawg" is another term for a "member" in a gang. I have been to several law enforcement seminars regarding gang intel and I have never heard that the word "dawg"' was affiliated with a gang and/or that is was an identifying word for a "Blood" gang member.

All of Inmate Carey's allegations and statements in this law suit are false except the partial statement that his mattress is removed from his cell. This is a partial[ly] true statement because in the same statement he lies about who took it, why it was removed from his cell, how long it was removed from his cell, and that the fact that all disciplinary segregation inmates have their mattresses removed from the cell during the day Monday thru Friday.

*Defs.' Exh. D - Doc. No. 23-4* at 1-5.

In his affidavit, Sgt. Whitley responds to the claims lodged against him and explains

his lack of interaction with Carey in November and December of 2013.

Inmate Carlos Carey claims in his lawsuit that I have threatened him with violence, and have tried to bribe other inmates to harm him if he does not drop his chargers. I have never said anything to Inmate Carey concerning his lawsuits nor have I hear[d] any officer say anything to Inmate Carey about his lawsuits. I have never tried to bribe an inmate to harm Inmate Carey if his does not drop the charges; and/or for any reason. Inmate Carey's allegations are false.

Inmate Carey claims that other inmates are harassing him and that an Inmate threw urine and/or a mixture of something in his face. There is no report of anyone throwing anything in Inmate Carey's face or him reporting such an allegation during the entire time he has been housed at Bullock Correctional Facility. The only time Inmate Carey was in a cell with another inmate was from August 22 to September 23 [of 2013]. To protect other inmates, Inmate Carey has been housed in a single cell, by himself since September 23, 2013. Due to Inmate Carey's custody level, he is not allowed to have any close contact with other inmates. The only time Inmate Carey is allowed out of his cell; except for medical emergencies and/or to be escorted to the Warden's office per the Warden's request, is for exercise. Inmate

Carey's custody level mandates that he must be on the exercise yard by himself and/or with no more than three other Close custody inmates at the same time. All inmates are restrained when they are on the exercise yard and are under the direct supervision of the Segregation Officers at all times. They are also searched prior to entering the yard. If Inmate Carey is claiming this occurred during November and/or December; it would have had to happen on the exercise yard. There is no report of any incident occurring on the exercise yard when Inmate Carey was present….

All inmates housed in the Segregation Unit for disciplinary segregation time have their mattresses removed during the day from the hours of 7:00am-4:00pm, Monday thru Friday. Disciplinary segregation inmates' mattresses are not removed from their cell for any amount of time on weekends. Inmate Carey's claim that his mattress is taken every day is false. The inference that Inmate Carey's mattress has been taken away from him every day and he is forced to sleep on the concrete is false. As stated above, Inmate Carey's mattress is removed, along with the other disciplinary segregation inmates for a specified time period during the week. Inmate Carey and all other inmates have their mattresses returned to them at 4:00pm and have their mattresses in their cell until the next morning; around 7:00am. Inmate Carey is treated the same as all inmates serving segregation time.

Inmate Carey stated in his lawsuit that these violations occurred in November and December of 2013. I only worked five days during the month of November and was out on medical leave from November 11, 2013 until January 2, 2014. I had no direct contact with Inmate Carey during the five days I worked in November. As a matter of fact the only time I was in the Segregation Unit, where Inmate Carey is housed, during the time frame he states the violations occurred, was on November 8, 2013. Supervisors are required to make a tour of the Segregation Unit during their Shift. On November 8, 2013, I enter[ed] the Segregation Unit at the beginning of my shift for a tour. I entered at 6:05am and departed at 6:09am. I again, entered the Segregation Unit at the end of my shift for another tour. I entered at 5:45pm and departed at 5:48pm. Therefore I was only in the Segregation Unit where Inmate Carey is housed, for seven minutes during the month of November and at no time during the month [of] December when he stated these violations occurred.

*Defs.' Exh. E - Doc. No. 23-5* at 1-3.  Defendants King and Randolph likewise deny

threatening Carey and further assert that they did not attempt to bribe other inmates to harm

Carey.  *Defs.' Exh. F - Doc. No. 23-5* at 1-2; *Defs.' Exh. G - Doc. No. 23-7* at 1-2.  These

officers also aver that they are not assigned to the Segregation Unit at Bullock and have therefore "had no contact with Inmate Carey" during the time the alleged actions occurred. *Id*.

Federal law recognizes "that 'courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform.' [*Procunier v. Martinez*, 416 U.S. 396, 405, 94 S.Ct. 1800, 1807 (1974)]. As the *Martinez* Court acknowledged, 'the problems of prisons in America are complex and intractable, and, more to the point, they are not readily susceptible of resolution by decree.' *Id*., at 404-405, 94 S.Ct., at 1807. Running a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources." *Turner v. Safley*, 482 U.S. 78, 84-85 (1987). Correctional officials are therefore "accorded latitude in the administration of prison affairs[,]" *Cruz v. Beto*, 405 U.S. 319, 321 (1972), which necessarily includes "the [inescapable] withdrawal or limitation of many [inmate] privileges and rights." *Pell v. Procunier*, 417 U.S. 817, 822 (1974) (quotation marks and citation omitted); *Bell v. Wolfish*, 441 U.S. 520, 546 (1979).

 "In the First Amendment context, . . . some rights are simply inconsistent with the status of a prisoner or 'with the legitimate penological objectives of the corrections system.'" *Shaw v. Murphy*, 532 U.S. 223, 229 (2001), quoting *Pell*, 417 U.S. at 822. In accordance with this principle, an inmate's rights established under the First Amendment are not protected if allowing such protection is "inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Pell*, 417 U.S. at

18

822.  Thus, while inmates retain a constitutional right protected by the First Amendment to submit complaints to supervisory officials, this right is limited by the fact of incarceration and valid penological objectives such as maintaining institutional security and order.  The law is well settled that "central to all other corrections goals is the institutional consideration of internal security within the corrections facilities themselves." *Pell*, 417 U.S. at 823; *Bell v. Wolfish*, 441 U.S. at 546 ("[M]aintaining institutional security and preserving internal order and discipline are essential goals that may require limitation or retraction of the retained constitutional rights of both convicted prisoners and pretrial detainees.").  It is therefore clear that preservation of security and order within a correctional facility is essential to the facility's effective administration and constitutes both a compelling and substantial governmental interest.  *Pell*, 417 U.S. at 823; *Lawson v. Singletary*, 85 F.3d 502, 512 (11th Cir. 1996); *Harris v. Chapman*, 97 F.3d 499, 504 (11th Cir. 1996).

"The first amendment prohibits state officials from retaliating against prisoners for exercising their right of free speech.  *See, e.g., Wright v. Newsome*, [795 F.2d 964, 968 (11th Cir. 1986)]. . . . The gist of a retaliation claim is that a prisoner is penalized for exercising a right of free speech."  *Thomas v. Evans*, 880 F.2d 1235, 1241-1242 (11th Cir. 1989); *Farrow v. West*, 320 F.3d 1235, 1248 (11th Cir. 2003).  "In prison, of course, first amendment rights are not absolute.  *Pell v. Procunier*, 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974).  Legitimate policies and goals of the correction system may justify restrictions limiting prisoners' [First Amendment] rights.  417 U.S. at 821."  *Adams v.*

*James*, 784 F.2d 1077, 1081 (11th Cir. 1986).  "A prisoner retains those First Amendment rights that are 'not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrective system.'  *Prison Legal News v. Cook*, 238 F.3d 1145, 1149 (9th Cir. 2001) (quoting *Jones v. North Carolina Prisoners' Labor Union, Inc*., 433 U.S. 119, 129, 97 S.Ct. 2532, 53 L.Ed.2d 629 (resist)) (internal quotation marks omitted). . . . [P]rison authorities have a legitimate penological interest in the consistent enforcement of prison rules and ... disciplining prisoners who attempt to coerce a guard into not enforcing prison rules is reasonably related to that interest." *Hargis v. Foster*, 312 F.3d 404, 409-410 (9th Cir. 2002); *see also Jackson v. Cain*, 864 F.2d 1235, 1248 (5th Cir. 1989).  The situation is somewhat complicated when the alleged act of retaliation is undertaken to assure compliance with prison rules as inmates often attempt to "inappropriately insulate themselves from [such] actions by drawing the shield of retaliation around them." *Woods v. Smith*, 60 F.3d 1161, 1166 (5th Cir. 1995), *cert. denied sub nom Palermo v. Woods*, 516 U.S. 1084 (1996).

It is essential that federal courts "carefully scrutinize retaliation claims" brought by prisoners challenging adverse actions of correctional personnel.  *Woods*, 60 F.3d at 1166.  "[C]ourts must approach prisoner claims of retaliation with skepticism and particular care. *See Flaherty v. Coughlin*, 713 F.2d 10, 13 (2nd Cir. 1983).  This is [necessary because prisoners'] . . . claims of retaliation are . . . easily fabricated [and] pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration.  This is so because virtually any adverse action taken against a prisoner by a prison official--even

those otherwise not rising to the level of a constitutional violation--can be characterized [by the prisoner] as a constitutionally proscribed retaliatory act." *Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001), overruled on other grounds, *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002).

To proceed on a claim for retaliation and withstand the entry of summary judgment, an "inmate must establish . . . three elements: (1) his speech was constitutionally protected; (2) the inmate suffered adverse action such that the [defendants'] allegedly retaliatory conduct would likely deter a person of ordinary firmness from engaging in such speech; and (3) there is a causal relationship between the retaliatory action and the protected speech. *See Bennett v. Hendrix*, 423 F.3d 1247, 1250, 1254 (11th Cir. 2005)." *Smith v. Mosley*, 532 F.3d 1270, 1276 (11th Cir. 2008); *Thaddeus-X v. Blatter*, 175 F.3d 378, 397 (6th Cir. 1999). With respect to the causal relationship element, a prisoner must demonstrate that correctional officials intended to retaliate for his exercise of a right protected under the First Amendment and, but for the retaliatory motive, the adverse act complained of would not have occurred. *Woods*, 60 F.3d at 1166; *Smith*, 532 F.3d at 1278.

An inmate has the initial burden of establishing a prima facie case of unlawful retaliation by showing "that his conduct was constitutionally protected and that this conduct ... was a 'motivating factor'" behind the adverse action of the defendant. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977). Merely alleging the ultimate fact of retaliation, however, is insufficient. *Cain v. Lane*, 857 F.2d 1139, 1142, n.6 (7th Cir. 1988); *Woods*, 60 F.3d at 1166. Additionally, conclusory allegations are

insufficient to demonstrate the existence of each element requisite to establishing retaliation. *Morales*, 278 F.3d at 131; *Bennett v. Goord*, 343 F.3d 133, 137 (2d Cir. 2003) (Because prisoner retaliation claims are prone to abuse, "we are careful to require non-conclusory allegations."). If an inmate meets his burden with appropriate evidence, the burden of production shifts to the defendant to show that he "would have reached the same decision as to [plaintiff's discipline] even in the absence of the protected conduct." *Mt. Healthy*, 429 U.S. at 287. "Under the *Mt. Healthy* approach, if the government official 'can prove that [he] would have taken the adverse action in the absence of the plaintiff's protected conduct, [he] cannot be held liable.' *Thaddeus-X*, 175 F.3d at 388 n.4." *Smith*, 532 F.3d at 1278 n.22.

Carey alleges that the defendants verbally harassed/threatened him, increased his time in disciplinary segregation and removed his mattress while in segregation for submitting complaints about correctional officials and filing a previous lawsuit with this court, thus satisfying the first element of his retaliation claim. *Smith*, 532 F.3d at 1277. The second element requires Carey to demonstrate that the challenged actions "would likely deter a [prisoner] of ordinary firmness" from voicing complaints and filing legal actions challenging the behavior of correctional officers. *Id.* This "presents an objective standard and a factual inquiry." *Id.* There is nothing before this court which indicates that the challenged actions would deter an ordinary inmate from complaining or filing lawsuits and, in the experience of this court, the opposite is true. For instance, the records of this court establish that Carey was not in any way deterred in either of these pursuits.

Nevertheless, assuming *arguendo* that this standard has been met as to the alleged increased time in segregation and removal of mattress actions, Carey fails to satisfy the third requisite element of a retaliation claim—a causal connection between his constitutionally protected activities and the alleged adverse actions of the defendants. The causal connection inquiry focuses on the "subjective motivation of the defendant[,]" *Thaddeus-X*, 175 F.3d at 399, and this court must therefore determine "whether the defendant[] [was] subjectively motivated to discipline" Carey for complaining to supervisory officials and filing a lawsuit. *Smith*, 532 F.3d at 1278. The subjective motivation issue is resolved by most courts under the burden-shifting formula set forth in *Mt. Healthy*. This formula requires that the plaintiff first meet "his burden of establishing that his protected conduct was a motivating factor behind any harm" and then "the burden of production shifts to the defendant. If the defendant can show that he would have taken the same action in the absence of the protected activity, he is entitled to prevail on summary judgment." *Thaddeus-X*, 175 F.3d at 399 (referencing the Mt. Healthy motive analysis).

The defendants deny the allegations of retaliation made by Carey. Specifically, the defendants maintain that they did not verbally threaten or harass Carey and further argue that the adverse actions about which Carey complains, confinement in disciplinary segregation and removal of his mattress while in segregation, occurred due to the punishment imposed upon Carey for five separate disciplinary infractions and in an effort to maintain security in accordance with the standard operating procedures of the segregation unit. Carey offers only his conclusory allegation of ultimate fact that the

defendants retaliated against him for complaining about the actions of correctional officials and filing a lawsuit. This allegation is insufficient to defeat summary judgment. *Waddell*, 276 F.3d at 1279; *Holifield*, 115 F.3d at 1564, n.6. The record before the court is devoid of admissible or potentially admissible evidence, direct or otherwise, from which a reasonable fact finder could infer the requisite motivating factor as to each of the alleged acts of retaliation. Additionally, the circumstances, when taken as a whole, do not support making such an inference. Thus, Carey's retaliation claim falters on this element. Moreover, even assuming a fact finder could reasonably infer the motivating factor element insofar as Carey challenges the 6-month period of confinement in disciplinary segregation and the removal of his mattress during the day on Monday-Friday, it is clear under *Mt. Healthy* that correctional officials would have disciplined Carey regardless of any complaints or lawsuit because Carey's insubordinate and assaultive behavior constituted violations of institutional rules. *Turner*, 482 U.S. 91-92. "Objective prison administrators standing in [the defendants'] shoes would assume that [allowing a violation of institutional rules] ... would be noised about the prison's population and, if ignored, could seriously impede their ability to maintain order and thus achieve the institution's penological objectives." *Smith*, 532 F.3d at 1279. In light of the foregoing, the defendants are entitled to summary judgment on the retaliation claim presented by Carey.

### B.  Threats and Harassment

Any claim presented by Carey with respect to alleged verbal harassment and threats, standing alone, likewise provides no basis for relief as the law is well-settled that

derogatory, demeaning, profane, threatening or abusive comments made by correctional officials to an inmate, no matter how repugnant or professional, do not rise to the level of a constitutional violation.  *Edwards v. Gilbert*, 867 F.2d 1271, 1274 n.1 (11th Cir. 1989) (mere verbal taunts or threats, despite their distressing nature, directed at an inmate by officers do not violate the inmate's constitutional rights); *Ayala v. Terhune*, 195 F. App'x 87, 92 (3d Cir. 2006) ("[A]llegations of verbal abuse, no matter how deplorable, do not present actionable claims under § 1983."); *McBride v. Deer*, 240 F.3d 1287, 1291 n.3 (10th Cir. 2001) ("[A]cts . . . resulting in an inmate being subjected to nothing more than threats and verbal taunts do not violate the Eighth Amendment."); *Sims v. Hickok*, 185 F.3d 875 (10th Cir. 1999) (district court's summary dismissal of inmate's complaint for failure to state a claim appropriate because officer's insults and racial slurs did not amount to a constitutional violation); *Ivey v. Wilson*, 832 F.2d 950, 954-955 (6th Cir. 1987) (verbal abuse alone is not violative of the Eighth Amendment); *O'Donnell v. Thomas*, 826 F.2d 788, 790 (8th Cir. 1987) ("alleged verbal threats by jail officials ... did not rise to the level of a constitutional violation."); *Gaul v. Sunn*, 810 F.2d 923, 925 (9th Cir. 1987) (Eighth Amendment trivialized by assertion that mere threat constitutes a constitutional wrong); *Purcell v. Coughlin*, 790 F.2d 263, 265 (2d Cir. 1986) (mere name-calling did not violate inmate's constitutional rights); *Collins v. Cundy*, 603 F.2d 825, 827 (10th Cir. 1979) (verbal abuse, including threat of harm, not actionable under § 1983).

### C.  Lack of Investigation

Carey appears to complain that defendants Mason and Jenkins failed to investigate his complaints against other correctional officials. This allegation, however, fails to state a claim cognizable in this cause of action.

"It is well-settled that § 1983 does not create a federal right or benefit; it simply provides a mechanism for enforcing a right or benefit established elsewhere." *Oklahoma City v. Tuttle,* 471 U.S. 808, 816 (1985).  "The Due Process Clauses generally confer no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual." *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 196 (1989). "The law is clear that inmates do not enjoy a constitutional right to an investigation of any kind by government officials."  *Banks v. Annucci*, 48 F. Supp. 3d 394, 414 (N.D. N.Y. 2014); *Wilkins v. Illinois Dep't of Corr.*, 2009 WL 1904414, at *9 (S.D. Ill. 2009) (recognizing that inmates have no due process right to an investigation); *see also Torres v. Mazzuca*, 246 F. Supp. 2d 334, 342 (S.D. N.Y. 2003) (holding that prisoners do not have a due process right to an investigation of grievances).  Based on the foregoing, the court concludes that the alleged lack of an adequate investigation does not rise to the level of a constitutional violation and, therefore, provides Carey no basis for relief.

### VI.  CONCLUSION

Accordingly, it is the RECOMMENDATION of the Magistrate Judge that:

1.  The defendants' motion for summary judgment be GRANTED.

26

2.  Judgment be GRANTED in favor of the defendants.

3.  This case be dismissed with prejudice.

4.  The costs of this proceeding be taxed against the plaintiff.

It is further

ORDERED that on or before January 17, 2017 the plaintiff may file objections to the Recommendation. The plaintiff must specifically identify the factual findings and legal conclusions in the Recommendation to which objection is made; frivolous, conclusive, or general objections will not be considered.  Failure to file written objections to the Magistrate Judge's findings and recommendations in accordance with the provisions of 28 U.S.C. § 636(b)(1) shall bar a de novo determination by the District Court of legal and factual issues covered in the Recommendation and waives the right of the plaintiff to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions accepted or adopted by the District Court except upon grounds of plain error or manifest injustice.  11TH Cir. R. 3-1; *Resolution Trust Co. v. Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir. 1993); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989).

Done this 3rd day of January, 2017.


_____/s/____Wallace Capel, Jr._____
UNITED STATES MAGISTRATE JUDGE